W. T. BRINSON, IN BEHALF OF HIMSELF AND ALL THE STOCKHOLDERS AND CREDITORS OF THE MILL SUPPLY COMPANY, v. THE MILL SUPPLY COMPANY, A CORPORATION.

(Filed 7 May, 1941.)

1. **Corporations § 34—Payee of individual notes of secretary-treasurer of corporation may not file claim against receiver on corporation's accommodation endorsement of the notes.**

The agreed facts disclose that the secretary-treasurer of a corporation purchased stock from the corporation, executing his note to the corporation secured by the stock certificates, that thereafter he borrowed money from a third person and took up his note to the corporation and executed to the third person his individual note for the money borrowed and delivered the stock certificates to her as security, and, at her request, endorsed the note in the name of the corporation by himself as secretary-treasurer, and that later, in order to buy more stock, he borrowed another sum of money from the same third person and executed to her his note secured by the stock certificate purchased, and endorsed the note in the name of the corporation by himself as secretary-treasurer. *Held:* Both the transaction in borrowing money to take up his note to the corporation for stock previously purchased by him, and the transaction in borrowing money with which to purchase additional stock, was for the individual benefit of the secretary-treasurer of the corporation, from which transactions the corporation received no benefit, and the endorsements being beyond the express or implied powers of the corporation and *ultra vires*, the claim of the payee of the notes against the corporation on the endorsements should have been disallowed.

2. **Corporations § 21—Corporation is not estopped from asserting that transaction was ultra vires unless it accepts and retains benefit from the transaction.**

The secretary-treasurer of a corporation borrowed money with which to pay the corporation for shares of its capital stock purchased by him, and executed to the lender his notes for the amounts borrowed, and

endorsed the notes in the name of the corporation by himself as secretary-treasurer. The corporation entered on its accounts receivable the checks drawn by such third person for the money loaned, and credited the checks on the stock account of its secretary-treasurer. *Held:* The corporation received no benefit from the act of its officer in borrowing the money, and therefore its act in accepting the checks and crediting the same to the stock account of its officer does not estop the corporation from asserting that the endorsement of the notes was *ultra vires* the corporation.

**3. Same: Principal and Agent §12—**

The doctrine of ratification generally applies only when the person sought to be charged accepts the benefits of an unauthorized or *ultra vires* act and, with full knowledge of the material facts, fails to repudiate the transaction.

**4. Corporations § 21—Corporation held to have received no benefit from ultra vires act of secretary-treasurer and therefore doctrine of ratification is inapplicable.**

The secretary-treasurer of a corporation borrowed money with which to pay the corporation for shares of its capital stock purchased by him, and executed to the lender his notes for the amounts borrowed and endorsed the notes in the name of the corporation by himself as secretary-treasurer. Thereafter the corporation, in paying dividends on the stock represented by the certificates issued to its officer, made checks payable to the third party holding the certificates as collateral security and credited same to the personal account of the officer. *Held:* The action of the corporation in issuing its dividend checks to such third person is not a ratification by the corporation of the act of its secretary-treasurer in endorsing the notes in the name of the corporation, since the corporation received no benefit from the *ultra vires* endorsement, and further, was not chargeable with knowledge of the acts of its officer.

**5. Same—**

A corporation is not chargeable with knowledge of its officers or agents in respect to a transaction in which they act for their own personal benefit and not in any official or representative capacity for the corporation.

**6. Same: Estoppel § 6e—**

The rule that where one of two innocent parties must suffer loss from the wrongful acts of a third person, the party first reposing confidence in the wrongdoer must suffer the loss, does not apply where a corporate officer uses the credit of the corporation for his own personal benefit, since the person dealing with the corporate officer is charged with knowledge that the officer has no authority to so bind the corporation.

APPEAL by Edward F. Smallwood, receiver of The Mill Supply Company, from *Thompson, J.,* at 26 December, 1940, Term, of CRAVEN.

Civil action instituted 3 February, 1940, for the appointment of receiver on account of imminent danger of insolvency of defendant, The Mill Supply Company, a corporation.

The court appointed Edward F. Smallwood as such receiver and he entered upon the duties of the position.

The estate of Mrs. Lida P. Duffy, who died 8 January, 1938, filed claim with the receiver, predicated upon two notes, the first dated 19 May, 1927, for $2,500, and the second 1 April, 1929, for $1,000, each executed by A. F. Patterson, and each bearing on the back thereof this endorsement: "The Mill Supply Company, by A. F. Patterson, Secretary and Treasurer." The receiver disallowed the claim and reported such disallowance to the court. The executor of Mrs. Lida P. Duffy, to wit, Rudolph Duffy, excepted and appealed to the Superior Court, and upon controversy thus arising the parties agreed upon and submitted to the judge holding the courts of the district a statement of facts and agreed that such judge should pass upon same and render judgment with like effect as though same had been found by a jury in term.

The agreed facts are substantially these: The Mill Supply Company was incorporated by charter filed 10 December, 1923. Among the pertinent provisions contained in the charter, briefly stated, are these: (1) ". . . To lend money on bonds secured by mortgages on real estate or other personal property . . ."; (2) To "purchase . . . bonds, . . . shares of capital stock, and other securities, obligations and contracts and indebtedness of any private . . . corporation; . . . to receive . . . and dispose of . . . debentures, notes, shares of capital stock, securities, obligations, contracts, evidence of indebtedness and other property held or owned by it, and to exercise in respect of all such . . . any and all the rights, powers and privileges of individual owners thereof; to do any and all acts and things tending to increase the value of the property at any time held by the corporation . . ."; but "nothing herein is to be construed as intended to form a banking company, a trust company, a savings bank or a corporation intended as a part of its business to derive profit from the loan and use of money"; (3) To "acquire the good will, rights, profit and assets of all kinds and to undertake the whole or any part of the liabilities of any person, firm, association or corporation, and to pay for the same in cash, stock, bonds, debentures, notes or other securities of this corporation or otherwise"; (4) To "use and apply its surplus earnings or accumulated profits authorized by law to be reserved, to the purchase or acquisition of property and to the purchase or acquisition of its own capital stock from time to time, to such extent and in such manner and upon such terms as its board of directors shall determine"; (5) "To borrow or raise moneys for any purpose of its incorporation, to issue its bonds, notes, or other obligations for moneys so borrowed, or in payment of or in exchange for, any

real or personal property or rights . . . acquired or other value received by the corporation and to secure such obligations by pledge or mortgage under a deed of trust or otherwise, of or upon the whole or any part of the property at any time held by the corporation, and to sell or pledge such bonds, or discount such notes or other obligations, for its proper corporate purposes."

The by-laws provide for a manager and treasurer, and prescribe their duties. It is provided, among other things not here pertinent, that the manager shall have general control of the operation and affairs of the company, subject to the control of the directors. It is further provided that the treasurer "shall perform all the duties usually performed by a treasurer, and as such, he shall collect, receive and hold the money of the company; endorse and collect all checks and negotiable instruments and keep full and accurate accounts of the receipts and disbursements of the company, rendering a full account to each regular stockholders' meeting."

According to the minutes of the first meeting of the stockholders and directors held on 21 December, 1923, A. F. Patterson was elected to the position of secretary-treasurer and general manager and held these positions up to and including the meeting on ..... February, 1933, at which time he was elected president and served in that capacity until receiver was appointed, in February, 1940.

At a stockholders' meeting in 1925 the officers were empowered to issue stock up to $110,000, including the stock already issued, provided it were deemed necessary by them. From time to time theretofore and thereafter directors authorized loans to be obtained or money borrowed— to wit: (a) On 18 February, 1924, A. F. Patterson was authorized to procure a loan not to exceed $20,000 from the Murchison National Bank, of Wilmington, North Carolina, and to pledge the faith and credit of the company for same; (b) on 10 August, 1926, the secretary was authorized to borrow $5,000 from the Seaboard National Bank of Norfolk, Virginia, and to open an account with it; (c) on 11 January, 1927, the secretary was authorized to borrow $5,000 from the Murchison National Bank of Wilmington, North Carolina, and to arrange an extension on bonds held against the real estate of the company; (d) on 19 December, 1927, the secretary was authorized to arrange for loan not over $15,000 for five years and to give a second mortgage on the real estate of the company to protect same; (e) on 1 November, 1929, the executive committee authorized the general manager to borrow such additional funds as were found to be necessary to meet the current obligations of the company in addition to bonds maturing on or before 1 January, 1930, and to hypothecate insurance policies on any and all

employees of the company, and to use the equity accumulated against these policies, and such portion as has accumulated in the Building and Loan stock of the company for this purpose; and (f) on 21 February, 1930, the secretary and treasurer was authorized to negotiate a loan with the South Carolina National Bank at Charleston not to exceed $10,000—to be used for the specific purpose of retiring any loans of equal amount which the company may have with the Seaboard National Bank of Norfolk or the North Carolina Bank & Trust Company at Wilmington.

There were no other specific directions or authority expressed in the minutes to borrow money between the date of the organization of the corporation and the date of 21 February, 1930.

Under date of 19 May, 1927, A. F. Patterson executed and delivered his note for $2,500 to Mrs. Lida P. Duffy, payable on demand at the office of The Mill Supply Company, and entered on back of said note this endorsement, "The Mill Supply Company, A. F. Patterson, Secretary," and secured the same by deposit with her of certificate No. 50 for 35 shares of capital stock of The Mill Supply Company issued to A. F. Patterson. He informed her that the purpose of borrowing said money was to enable him to pay a note given by him to The Mill Supply Company for said stock. She requested that the company endorse the note and Patterson, "believing that he had the authority and privilege entered the endorsement recited above," and thereupon delivered the note as so endorsed by him to Mrs. Duffy, and received the payments hereinafter recited. Patterson had previously agreed with Mrs. Duffy that since the stock paid ten per cent dividend, she would receive ten per cent on the money so loaned.

The general ledger of the company, under heading of "Notes Receivable," contains entries of credits by checks—two as "(A. F. Patterson) L.D." and one "(A. F. Patterson) on note for L. D."—aggregating $2,500, indicating and meaning that Mrs. Lida Duffy's checks were credited on the note of A. F. Patterson given to and held by Mill Supply Company for purchase price of stock evidenced by said stock certificate No. 50, which the company held as collateral to the note.

On 1 April, 1929, A. F. Patterson executed and delivered to Mrs. Lida P. Duffy his note for $1,000 payable on demand at the office of The Mill Supply Company, and endorsed on the back thereof, "The Mill Supply Company by A. F. Patterson, Secretary and Treasurer," and secured same by stock certificate No. 97, issued to A. F. Patterson on 1 April, 1929, for ten shares of capital stock of The Mill Supply Company. The certificate was transferred in blank by Patterson and deposited with Mrs. Duffy, who then issued check for $1,000, which was received by The Mill Supply Company on 12 April, 1929, entered upon

its "Accounts Receivable" ledger as a charge to capital stock account and credited to A. F. Patterson.

The general ledger of the company shows that beginning in the month following the dates of the two notes, respectively, and continuing monthly thereafter to and through the year 1936, during which time The Mill Supply Company paid ten per cent dividend on its stock, checks of the company for an amount equal to monthly installment of ten per cent annual dividend on the number of shares of stock represented by said certificates Nos. 50 and 97, respectively, payable to Mrs. Lida P. Duffy, were paid and charged to the account of A. F. Patterson—the same account in which his salary check was credited. The general ledger also shows that after 1936 the checks, reduced to an amount equal to monthly installment of six per cent annual dividend on such number of shares of stock, were issued and credited in like manner to those issued prior thereto.

"In addition to payment by check, merchandise was purchased by Mrs. Duffy and later by her executor and charged to her and . . . certain of these charges were offset against interest payments on the notes by the company and to that extent were likewise charged on the company's book to the account of A. F. Patterson."

At time of her death Mrs. Duffy was indebted to company for merchandise, and since her death her executor has purchased other items. Eliminating any charged items for which account has been taken, it is agreed that the account is now $500, which shall be credited on notes if Court should hold that receiver shall allow claim. But if claim be not allowed, the estate of Mrs. Duffy is indebted to company in the sum of $500.

While denying the claim filed, the receiver admits that the stock held as collateral to the notes given by Patterson to Mrs. Duffy will be entitled to share in any distribution of assets to stockholders.

Upon the facts agreed, the court below being of opinion that the two notes are liabilities of The Mill Supply Company, and should be allowed as such, entered judgment therefor less the agreed credit of $500.

The receiver appeals therefrom to Supreme Court, and assigns error.

*W. B. R. Guion for Duffy, Executor, appellee.*
*R. E. Whitehurst for Receiver, appellant.*

WINBORNE, J. The factual situation shown in the record on this appeal presents these determinative questions:

1. When the secretary-treasurer of a corporation borrows money from a third party for the express purpose of paying, and pays his indebtedness to the corporation for purchase of shares of its capital stock—

evidenced by his note to which as collateral security certificate previously issued to him for such stock is attached, and, for the money borrowed, executes and delivers to such third party his note with and secured by such stock certificate and. with the knowledge and at the request of such third party, endorsed by the secretary-treasurer in the name of the corporation by him as such officer, without express charter authority, is the corporation liable to such third party by reason of such endorsement?

2. When the secretary-treasurer of a corporation thereafter borrows money from the same third party with which to buy and does buy from the corporation shares of its capital stock and stock certificate is issued to him, and, for the money borrowed, he executes and delivers to the third party his note, with and secured by such stock certificate, and endorsed by him in the name of the corporation by him as such officer, without express charter authority, is the corporation liable to such third party by reason of such endorsement?

3. If not, do the facts that checks of the third party, covering the amount of the first loan to the officer, secretary-treasurer, were actually received by the corporation and entered upon "Notes Receivable" ledger account as credit on the note of officer, and that the check for the second loan was actually received by the corporation and entered upon its "Accounts Receivable" ledger as a charge to capital stock account and credited to the officer, so inure to the benefit of the corporation as to render it liable under the doctrine of estoppel?

4. Does the fact that the corporation, in paying dividends on the stock, represented by the two certificates issued to the officer, individually, and deposited by him with the third party as collateral to his notes, made checks payable to the third party, and credited same to the personal account of the officer, constitute a ratification of the endorsement on the notes of the officer entered by him in the name of the corporation without express charter authority, and held by the third party?

5. Upon the facts of this case, is the principle that where one of two persons must suffer by the wrongful act of another the loss must fall upon the one who first reposed the confidence and made it possible for the loss to occur, available to claimant?

Careful consideration of them calls for a negative answer to each of these questions.

At the outset it is pertinent to note that all the evidence leads to one conclusion, that is, that the transactions here involved were for the sole benefit of A. F. Patterson individually.

In this light, the first and second questions are controlled by the decision of this Court entered cotemporaneously herewith in the case of *Brinson v. Supply Co., ante,* 499, involving a claim filed in the same receivership by the executrix of Mrs. Harriett L. Hyman, deceased.

There the Court, speaking through *Barnhill, J.,* holds as *ultra vires* the act of the Executive Committee of the Board of Directors of The Mill Supply Company in undertaking to guarantee the payment of a note of $5,000 given by A. F. Patterson to Mrs. Hyman and secured by certificate issued to him for fifty shares of the capital stock of said company.

The ruling is prefaced upon the principle that for a contract executed by an officer of a corporation to be binding upon the corporation it must appear that it was either expressly authorized or incidental to the business of the corporation and was properly executed.

The Court, then referring to the powers granted in the charter of The Mill Supply Company, the same powers involved in the present action, holds that no express authority is given to the corporation to issue accommodation paper or to guarantee the obligations of a third party. The Court further holds that under such circumstances the contract of guaranty is not incidental to or in furtherance of the powers expressly granted. Hence, the power to endorse or to guarantee the payment of a negotiable instrument for the benefit of a third party is not within the implied powers conferred upon the corporation. Therefore, the corporation had no authority to use its credit for the benefit of a shareholder or an officer. Reference is here made to the full discussion of the subject there. Further treatment here would be useless repetition.

3. As is stated by *Barnhill, J.,* in the case of *Brinson v. Supply Co., supra,* the principle that where a corporation has received the benefits under a contract which is incidental, it will be held liable under the doctrine of estoppel for the reason that it should not be permitted to accept and retain the benefits and at the same time disavow the contract on the plea of *ultra vires* has no application to the situation in hand. "It is when the corporation has received the full benefit of the contract that it will not be relieved of liability because the contract is *ultra vires*," citing authorities.

Here, A. F. Patterson, in the first instance, being indebted to the corporation for shares of its stock, and in the second desiring to buy more of its stock, purposes personal to him, borrowed money from Mrs. Duffy with which to discharge the first and to accomplish the second. No such benefit as is contemplated in the above principle accrued to the corporation.

4. Generally, a ratification, to bind the corporation, must be made with full knowledge of the material facts of the transaction. The principle is applicable when benefits of the unauthorized act or contract of the officer or agent accrue to the corporation and it fails to repudiate the transaction and to offer restitution. Likewise, a ratification will be implied when, in addition to receiving the benefits of the unauthorized transaction the corporation, with full knowledge of the facts, makes pay-

ments on account of such benefits, as where it pays interest under an unauthorized contract or makes payments on a note executed or endorsed on its behalf without authority. However, the general rule does not apply where no benefits result from the transaction, or where it receives the benefits under a separate and distinct transaction. 19 C. J. S., 488 and 500, Corporations, sections 1015 and 1020. See, also, *Lumber Co. v. Elias,* 199 N. C., 103, 154 S. E., 54; *Morris v. Basnight,* 179 N. C., 298, 102 S. E., 389.

In the present case it is sufficient to say that not only is there an absence of benefits to the corporation from the unauthorized acts of A. F. Patterson in endorsing the notes, but the payment of interest was for A. F. Patterson. He was entitled to dividends on the stock which he had deposited with Mrs. Duffy. The method of payment adopted, in so far as the corporation is concerned, merely constituted payment of dividends to Patterson.

Furthermore, it is a well settled principle of law that a corporation is not chargeable with the knowledge of its officers or agents in respect to a transaction in which such officer or agent is acting in his own behalf and does not act in any official or representative capacity for the corporation. *Brite v. Penny,* 157 N. C., 110, 72 S. E., 964; *Stansell v. Payne,* 189 N. C., 647, 127 S. E., 693.

5. In regard to the fifth question, the principle of law is well settled that an officer of a corporation cannot bind the corporation by his acts in respect to matters in which he is personally interested, *Brite v. Penny, supra; Grady v. Bank,* 184 N. C., 158, 113 S. E., 667; *Stansell v. Payne, supra,* and third persons are bound to know that an officer has no authority to use the credit of the corporation for his personal benefit. *Stansell v. Payne, supra.* Hence, the principle referred to in this question is not open to claimant.

Mrs. Duffy had notice that Patterson was acting, in these transactions, in the interest of himself and not for The Mill Supply Company. It appears that both she and Patterson acted in good faith, and believed that an endorsement made upon the note in the name of the company by him would be valid. But, as stated in *Stansell v. Payne, supra,* "this fact elicits sympathy . . . but cannot fix defendant with liability for the unauthorized act of" Patterson.

The judgment below is

Reversed.